## JOSIAH PRATT & others *vs.* NATHANIEL LAMSON & others.

Under a deed of a water privilege, conveying " the right to draw two hundred square inches of water, under fourteen feet head, out of the surplus water from the top of my grist-mill flume, at S.; however, not intending by this deed to convey the water to the injury of the following privileges, viz.: to the building now occupied by A. S. as a rake shop; to the tannery now occupied by A. B.; and the scythe shop now occupied by J. H. M.; having reference to the deeds of the above described privileges," the grantee's privilege is subject to the prior use of the quantity of water which, at the time of the conveyance, was reasonably necessary to carry on and operate, at all seasons of the year, and in the state and condition in which they then existed, the mills and works therein of the grantor; and also of the quantity belonging to the three privileges mentioned, reference being had to the deeds thereof for the amount. And the grantee's privilege is not increased by the subsequent removal of the rake shop, and the erection of a new and larger building on its site, which is used wholly for different purposes; or by the subsequent destruction of the scythe shop, and discontinuance of the use of water there, although the deed of the privilege for the scythe shop only conveyed the water to be used at that particular place; nor has he a right to complain of the place where, or the purposes for which, such prior use is made.

If a natural stream of water flows and forms the boundary between the lands of different proprietors, the fee of each owner includes one half of the bed of the stream; but each is entitled to use one half of the water which flows in the stream, without regard to the position and course of its principal channel and current.

If a proprietor of land which is bounded upon a natural stream appropriates to his own use so much of the passing water as he is enabled to control, by means of structures erected upon and within the limits of his own estate, even if it be the whole of it, he can thereby gain no prescriptive right to appropriate and use more than one half of the same, so long as the opposite proprietor neither uses, nor seeks to use, nor makes any provision, nor has any occasion, for the use of any part of the stream to which he is entitled.

If the general owner of a mill privilege, in which others are interested, has, with their knowledge, acquiescence and consent, built on his own land a new dam and works by which the water is supplied to a common flume, they cannot recover compensation for any damage which they may thereby sustain.

BILL IN EQUITY, praying relief by injunction and otherwise for the disturbance of the plaintiffs' water privilege at Shelburne Falls. The case was heard in this court before *Merrick*, J., who reported the same for the determination by the whole court of questions of law involved therein. The facts are stated in the opinion.

MERRICK, J. This case came on to be heard upon the bill and answers. And the parties having produced all their evidence necessary to a full development of the questions of law

in relation to their respective rights, under the several deeds by force of which they respectively claim, the presiding judge being of opinion that these should first be determined, reported the case to the whole court for that purpose, the parties at the same time agreeing that any facts in dispute between them, which, upon determination of these questions of law, should be found material to the final determination of the case, should be sub- mitted, under the directions of the court, to a jury.

The bill alleges, in substance, that the plaintiffs are the owners of a mill-site in Shelburne, situate at Shelburne Falls, on the north bank of the Deerfield River; that they erected, and have for a long time maintained, certain water-mills or shops thereon, with various machinery for the manufacture of axes, and that they are the owners of a certain water privilege and power for the operation of their machinery and works; that they derive their title to this site and water privilege from one David Crit tenden, who, at the time of his conveyance to Josiah Pratt under whom they claim, was the sole owner of the water priv ilege and power out of which his grant was made, excepting only such parts thereof as had previously been granted to par- ties named in a deed to said Pratt; and that this privilege and water power consisted of, and was constituted by, a dam at the head of Shelburne Falls, in Deerfield River, which dam extended across the thread and deepest portion of the current of the river, from the northern shore thereof, whereby the chief and much the larger portion of the water flowing in the stream in its ordinary stages was diverted and held for the supply of the canal and flume of the said Crittenden, and the several priv- ileges and works connected therewith, and that he was the owner of the land upon the shore of the river whereon the said canal, dam and flume were maintained; and that at the time of said conveyance by said Crittenden the said dam, canal and flume had been so kept up and maintained by him, and by the several parties from and through whom he derived his title, beyond memory, whereby he had acquired an indefeasible right to maintain said dam, and to take and use, and to grant to others the right to take and use, the chief and much the greater part

of the water of said river; that is to say, all that portion of it which would be diverted by the dam constructed as aforesaid. The bill further alleges that, since the conveyance to said Pratt by said Crittenden, all the estate and rights of the latter to the dam, water power and privilege, canal, flume, grist and saw-mills, and the land under and adjoining the same, and also the site upon which the building theretofore occupied by Alpheus Simonds as a rake shop stood, have passed by sundry convey-ances from him, subject to the previous grants made of, and out of, the same, and to all the duties, burdens, obligations and incumbrances, and rights under which the same were held, and have come to and become vested in the respondents, Lamson, Goodnow & Co., who are now the owners, and in possession, of the same, except so far as they may have conveyed or leased por-tions thereof to others, as particularly afterwards stated in the bill. And the bill further alleges that the two privileges, for the build-ing occupied by said Simonds as a rake shop, and that occupied by J. H. Morse & Sons for a scythe shop, mentioned in said deed of Crittenden, existed only by the reservation contained therein, and not by any grant or title independent thereof; that the rake shop has since been removed, and the scythe shop so changed as no longer to draw water from said flume; and that all rights to draw water from said flume for either of these buildings has wholly ceased and become extinguished. The bill then proceeds to allege that Lamson, Goodnow & Co., after they became owners as aforesaid, erected a new dam immediately above that above mentioned, extending across the whole breadth of the river; that they have greatly changed the old dam, canal, flume, mills and shops; that they, and the several parties to whom they have made conveyances, have erected new mills and buildings, and placed much new machinery therein, and have actually drawn for and applied in their operation large quantities of water, much beyond what, as against the plaintiffs, they had a right to take from the river, and that said new dam, and the bulkhead connected therewith, are so constructed as to impede and retard the entrance of the water into said canal and flume, and its free passage to the mills of the plaintiffs, and that by

these means, as well as by the way and manner in which they exercise control over the water in said river, the supply of water in said flume and the surplus thereof is materially diminished, and rendered uncertain and insufficient for the works of the plaintiffs, who have thereby been deprived of the power and privilege to which they are entitled, and been subjected to great inconvenience, loss, expense and damage.

The answer of Lamson, Goodnow & Co., in addition to many allegations and denials not necessary now to advert to, asserts that said new dam and buildings were erected in the belief of all persons interested in or using said privilege that the same would be greatly beneficial to them, and particularly with the full knowledge and approval of the plaintiffs; and it denies that, by reason of any of the causes alleged in the bill, the plaintiffs are or have been injured in the use or enjoyment of any water power or privilege to which they are entitled, or that they have been subjected to any loss, damage, expense or inconvenience, or that their property is or has been lessened in value, or that they are or have been otherwise injured by any wrongful act of the defendants. The other parties, defendants to the bill, either refer to and adopt the answer of Lamson, Goodnow & Co., or make replies which have no bearing upon the questions now at issue, and which therefore require no further present attention. From these answers, and from the facts disclosed in the report, it appears that Lamson, Goodnow & Co. are the real parties in interest in defence of the present suit; and that the matters in controversy are in fact between them and the plaintiffs.

It appears by the report of the case that on the 28th day of June 1843, David Crittenden, by his deed of that date, conveyed, with covenants of warranty, to Josiah Pratt, under whom the plaintiffs claim, and whose title they have acquired, a certain water privilege situated at Shelburne Falls, described as "the right to draw two hundred square inches of water, under fourteen feet head, out of the surplus water from the top of my grist-mill flume at said Shelburne Falls; however, not intending by this deed to convey the water to the said Josiah to the injury

of the following privileges, viz : to the building now occupied
by Alpheus Simonds as a rake shop, to the tannery now occu-
pied by Apollos Bardwell, and the scythe shop now occupied
by John H. Morse & Sons, having reference to the deeds of the
above described privileges."

At the time when this conveyance was made, the main priv-
ilege was constituted by a dam extending from the north shore
to a large rock in the midst of the falls, distant three or four
rods from the north, and ten or twelve from the south, shore.
Crittenden then owned all the land on the north shore from the
tannery to a point up the river beyond where Lamson, Good-
now & Co. have since placed the abutment of the new dam ;
and he owned also the whole water power and privilege on that
side of the river, except what had been conveyed for the tan-
nery, and the scythe shop of John H. Morse & Sons.   Nothing
had then ever been done by way of occupation or improvement
of the water power on the south, or Buckland, side of the river,
or under the right of the riparian proprietor there, nor was any-
thing of that kind ever done until after the construction of the
new dam in 1851.   But after Crittenden made said deed to Jo-
siah Pratt, Lamson, Goodnow & Co. acquired all his remaining
right, title and interest in and unto the land and water power
and privilege on the north shore, and they also became the own-
ers of the land on the opposite or south side of the river.   And,
under their title to the land on the south shore, they claimed
the right to make any and all use of the water to which ripa-
rian proprietors upon that shore were entitled.   Subsequently
to these acquisitions, they erected the new dam and buildings,
and made the changes in the old one which are mentioned and
complained of in the bill, and thereafter they used the whole
power of the stream at their own pleasure, and on either bank
of it, as from time to time they found it most for their interest
or convenience to do ; never however, as they contend, infringing
upon any right of the plaintiffs, or diminishing the quantity of
water to which they were entitled, or in any way doing them
any damage of which they can justly complain.

In this state of the facts, it becomes necessary to ascertain

and determine with precision what the water privilege conveyed by Crittenden to Pratt actually was; in what it consisted; and what was its full extent and its exact limitation. In the first place, it is certain that the right granted was not an absolute and unconditional right to take two hundred square inches of water under fourteen feet head; but only to take a quantity equivalent to that amount out of the surplus water flowing over the top of the grist-mill flume of the grantor, if there should be a surplus sufficient for that purpose. That is, it is a mere waste-water privilege; a right to begin to take of the water remaining and flowing over the grist-mill flume, after, but not until, all those who have prior rights shall have withdrawn and appropriated to their own use all the water to which they are respectively entitled; and then to continue to take it until the quantity received shall be equal to the two hundred square inches, under a head of fourteen feet, to which by the terms of the deed he is limited. The prior rights which are thus to be fully satisfied before there can, in the nature of things, be any surplus water to be taken or received by the grantee of Crittenden, are obviously those which are reserved in the deed, and those also to which third persons, strangers to the conveyance, and upon whose rights it could have no effect, were then entitled.

The reservations in the deed are, first, that in favor of the grantor himself, and secondly, those which are described as privileges attached to the rake shop of Simonds, the tannery, and the scythe shop of Morse. The first of these arises, not from any express terms or provisions in the deed, but by necessary implication from the description of the right or privilege granted. It cannot be supposed that by a grant of the right to take a portion of the surplus water from the top of the grist-mill flume the proprietor of the mills there intended to relinquish, abandon or destroy the propelling power by which they were worked and operated; and hence results the implication that the necessary power for that purpose is reserved. As to the other privileges which are particularly mentioned, it is expressly declared to be the intention of the grantor so to restrict and limit the conveyances as that the right granted shall not in its effects be injurious to

them.   The right to the enjoyment of those privileges is there-fore paramount to the right granted, by force of an express re-servation.

The report states that no controversy in regard to the tannery has arisen between the parties.   The defendants however claim that more water has been taken of late years for the tannery than used to be drawn for it in 1843, and that the proprietors have the right to draw and use all that is wanted in carrying on and conducting their works therein.   But this must depend upon the terms of the grant, which is to be resorted to for the purpose of ascertaining its extent.   Should there be any occa-sion for this, the extent of the right must be ascertained and determined upon a future trial.

But it appears from the report that the scythe shop of Morse was destroyed by fire in 1849, and that since that time the use of water from the grist-mill flume for that site has been discon-tinued; and also that the building described as " now occupied by Alpheus Simonds as a rake shop " has been wholly removed, and a new and larger one, devoted to an entirely different branch of manufacture, has been erected by the defendants on its site.   The plaintiffs contend that, by this discontinuance of the use of water at the scythe shop of Morse, and by the removal of the building of Simonds, and the entire change made in the appropriation of the land on which it stood, the privileges mentioned in the deed of Crittenden to Pratt, as being connected with or attached to those buildings, have been entirely extinguished; and that as against them the portion or quantity of water which the proprietors of those buildings were formerly entitled to use for the purpose of carrying on their respective operations therein, can no longer be taken by any one, but must be left to flow into, and thence over the top of the grist-mill flume, to increase the surplus out of which they are entitled to take water, until they receive the quantity designated in the deed under which their premises are held.

But this claim cannot be maintained.   A difficulty sometimes occurs upon the construction to be given to the language of deeds by which a mere water power is granted, in determining

24 *

whether it is a grant of water to carry a particular mill, and to be used only for that special and limited purpose, or is a grant of water sufficient to carry a particular mill, making reference to the mill only to indicate and measure the quantity of water power intended to be conveyed. Whenever the description is in such terms as to leave it in doubt which of these two kinds or species of grants was intended, the general rule adopted by the courts appears to be, so to interpret the deed as to make the privilege conveyed a grant of a certain quantity of power, and not of power limited to a specific use. *Ashley* v. *Pease,* 18 Pick. 275. *Tourtellot* v. *Phelps,* 4 Gray, 374. But this question can hardly arise in the present case, although the claim of the plaintiffs is predicated upon the assumption that all the privileges named in the deed of Crittenden to Pratt are not to be considered as measures of quantity but grants for a special and limited use. But it is to be considered that the only grant in that deed is of the privilege conveyed to Pratt, and that it is for the mere purpose of showing what that privilege is — of what that surplus, out of which he is to be permitted to take a designated quantity of water, if there shall be sufficient to enable him to do so, is to consist — that the other privileges are referred to as reservations from the grant. The parties could have had no other object in view in naming them than to make them parts of the description of that power and privilege to which the grantee was to become entitled under the deed. It was the only purpose that the reference and allusion to them could possibly subserve, and therefore it must be considered to have been the only purpose for which it was made. The privileges to which the owners of the tannery, the scythe and rake shops, were entitled, did not result from or depend at all upon that deed, or anything contained in it, nor could they be in any respect affected by its stipulations, or the restrictions it created or imposed. They existed under and by force of previous conveyances; and the deeds are here referred to merely as the sources to which the parties must resort for information as to the measure and quantity of water which might be taken and diverted under those conveyances. And whatever therefore may

be found, upon such reference, to be the terms in which those grants are expressed, or whether the grantees under those deeds were entitled to use the power and privilege conveyed to them at their pleasure for any purpose to which they might be applied, or only in a particular manner and for a single and designated object, they must be considered to have been referred to in this deed of Crittenden to Pratt *with* the sole purpose and intention of limiting and fixing, by a description of rights which were first to be enjoyed and satisfied, the surplus out of which his grantee was to divert and obtain, in a defined contingency, a certain specified quantity of water.[*]

From this view it is apparent that all the right which was conveyed by Crittenden to Pratt was the privilege of taking the water, if there should be any, which should be running to waste over the top of the grist-mill flume, after the quantity to which the grantor and the owners of the tannery, the scythe and rake shops were respectively entitled had been taken, used and appropriated, either by them, or by other persons afterwards succeeding to their rights, or otherwise becoming owners of their rights and privileges, and of the power out of which they were derived. For, as has already been suggested, when the privilege granted is a given quantity of power, not limited to any specific use, it may be appropriated to any purpose whatever, and by any person to whom it may be transferred or assigned. *Ashley* v. *Pease, Tourtellot* v. *Phelps, ubi supra.* The power or quantity of water to which Crittenden was, and to which his successors and assignees are, entitled, is the quantity which was reasonably

---

[*] By the deed of water power for the scythe shop, Joseph Merrill and others conveyed to John H. Morse, in 1836, " a privilege of water sufficient to carry two trip-hammers, one grindstone and one bellows, to be used on land now owned by said Morse, east of A. and R. B. Bardwell's tan-yard."

By the original deed of water power for the site of the rake shop, Joseph Merrill and others conveyed to Samuel Morse, in 1823, the land itself, " with the privilege of water sufficient to carry two trip-hammers, a grindstone and bellows." This land and privilege became vested, by mesne conveyances in 1836, in the grantors of D. Crittenden. Until 1836, four wheels were used there, but only one was used by Simonds in 1843.

necessary to carry on and operate, at all seasons of the year, and in the state and condition in which they then existed, the mills, and works therein, which at the time of his conveyance to Pratt were connected with, and operated by water taken from, the saw and grist-mill flumes. The quantity of water which might be taken, and the places from which it might be drawn, for the use of the tannery and the buildings occupied respectively as a scythe and a rake shop, must be ascertained by reference to the description contained in the deeds by which those privileges were created and conveyed.

But the surplus, which would remain to flow over the top of the grist-mill flume after the respective proprietors of these several privileges had used, appropriated and diverted all the water to which they were severally entitled, was liable, at the time of the conveyance to Pratt, and at all times thereafter, to be reduced by the exercise of the right of the riparian proprietor on the south or Buckland shore, opposite to the land of Crittenden, to take and use so much of the water flowing in the stream as he was entitled to have, by virtue of his ownership and possession of the land. This was one moiety of the whole. The principles of law, from which his right to take his share and proportion of the water and appropriate it during its passage by his land to his own use, is deduced, are familiar and indisputable. When a stream is used in a grant as a boundary or monument, it is used as an entirety to the centre of it, and to that extent the fee passes; so that, unless limited by some restriction, the proprietor of each bank is the proprietor of half the land covered by the stream. 3 Kent Com. (6th ed.) 428. *Bardwell* v. *Ames,* 22 Pick. 354. *Ingraham* v. *Wilkinson,* 4 Pick. 268. Angell on Watercourses, §§ 11, 12. And every proprietor of land on the banks of a river has naturally an equal right to the use of the water as it flows in the stream adjacent to his land, as it was wont to run, without other diminution or alteration than the inconsiderable interruptions which are the unavoidable result of its use in its passage by. 3 Kent Com. (6th ed.) 439. The whole doctrine is clearly stated in the opinion given by Shaw, C. J., in the case of *Tourtellot* v. *Phelps,* 4 Gray,

376, where it is said that each proprietor of land through which a natural watercourse flows has a right, as owner of such land, and as inseparably connected with and incident to it, to the natural flow of the stream for any hydraulic purpose to which he may think fit to apply it; and that this is the natural and inherent right of each riparian proprietor, and passes with it as parcel of the estate. The same doctrine is stated in Angell on Watercourses, §§ 100 *& seq.*, and is fully sustained by the authorities there referred to. It is quite certain therefore, that the owner of the land on the Buckland shore, opposite to that which was owned by Crittenden, had a right to share equally with him in the use of the water which flowed in the river through their lands.

And from a consideration of these principles, it is apparent that the rights of riparian proprietors on opposite banks, of the stream do not depend upon, and are not affected by, the locality of the channel or current through or along which the larger, or even the chief and principal, part of the water flows. Wherever this current may be, the central line in the bed of the stream parallel to and equally distant from each shore is the boundary of their lands. And as their respective rights to the use of the water do not result from this line of division, but arise by mere operation of law as incident to their ownership of the bank, the formation of the bed of the stream, its varying depth, and the consequent course and direction of the current, must be circumstances wholly immaterial. *Webb* v. *Portland Manuf. Co.* 3 Sumner, 189. Angell on Watercourses, § 101. The rule, which is a necessary inference from these principles, that parties so situated are each entitled to the use of an equal share and proportion of the running water, is not only simple, direct and equitable, but seems to be essential as the only practical rule by which their respective rights can be accurately ascertained or effectively protected. For it must be obvious that the difficulties would often be very great, if not wholly insurmountable, to find the exact course and direction of the channel, or to determine on which side of the boundary line the larger portion of the whole volume of the stream actually flows. But

besides this, the constant changes which are taking place in the bed of a river by the operation of natural causes — such as the formation of sand bars, or excavations caused by accumulation of water in times of flood — would, if any attempt were made to fix and settle the rights of parties according to the quantity of water which flowed nearer towards one shore than to the other, leave them in a state of constant confusion and uncertainty It is therefore not less a matter of practical necessity than of just inference from the legal principle under which their rights are derived, that the riparian proprietors on opposite shores should each be entitled to appropriate to their use equal parts and quantities of the water passing in the stream, without regard to variations in depth in different parts of its bed, or to the fact that the greater part of it flows nearer to one bank than the other.

There certainly does not appear to be in the bed, or banks, or current, or course of the flow of water in the Deerfield River at Shelburne Falls any peculiarity which requires that this beneficial rule should not be applied, in determining what are the rights of the respective claimants to the use of its running water. The plaintiffs claim that the space in the bed of the stream between the north shore and the rock to and upon which the dam of Crittenden was built and abutted, is the deepest channel in the stream, and would naturally take at least half the water in ordinary stages, and in low water considerably more than half. Assuming this statement to be perfectly correct, it certainly cannot be considered as a thing unusual, or an extraordinary characteristic of the Deerfield River. Probably in all considerable streams, the current varies in its course, sometimes running nearer on one, and then again more on the opposite shore. · It may be doubted whether a stream of any considerable magnitude can anywhere be found, in which the channel is invariably coincident with the line in the centre of its bed. The law, in declaring and establishing the rights of riparian proprietors to the use of running water, takes no notice of these deviations and changing courses, but, by a general rule applicable to the entire stream, assigns to each of them equal privileges in its enjoyment.

The plaintiffs further contend that Crittenden and those under whom he claimed, by the maintenance for a period beyond memory of the dam from the north shore to the rock three or four rods distant from it, and by the diversion of the water by the blasting and removal, in the year 1829, of a part of a rock near the beginning of the falls, by which an increased amount of water was turned into the pond, had acquired an absolute right to have the same quantity of water which, at the time of his conveyance to Pratt in 1843, flowed into the grist-mill flume or over his dam, continue to flow in the same course and direction; and that no part of the water which flowed there, in the condition of the channel in the river, the dam, flume, canal and water ways, as they existed at that time, can legally be diverted therefrom by the owner of the land on the opposite shore. Or, in other words, that by an adverse possession, continued for more than twenty years, an indefeasible right had been acquired by prescription to the use of the water as it was at that time used and appropriated by the owners of land, buildings and privileges on the northern shore of the stream. But this claim cannot be maintained; for, in fact, there was no adverse use, occupation or possession whatever. The dam was built and maintained wholly on the land belonging to those by whom it was built and maintained. They owned to the centre of the stream, and the rock upon which the dam abutted was several rods north of that line. As they occupied only their own land, they committed no disseisin, and were guilty of no infringement upon the right, or encroachment upon the property of any other person. In relation to the stream itself, it is now a well settled principle that no one, neither the riparian proprietor nor the owner of a mill, acquires or has any property in the water flowing in it, except as to that portion which he actually withdraws and holds in his own possession; but, instead of this, that he has a simple usufruct of it while it passes along. 3 Kent Com. (6th ed.) 439. Angell on Watercourses, §§ 94, 132. Under this general right, which is incident to the ownership of land bounded by and therefore extending to the thread of the stream, no exclusive title is acquired to one half or to any definite part, but, as is said by Story, J. in

*Webb* v. *Portland Manuf. Co.*, above cited, each of them is enti-
tled, *per my et per tout*, to the use of his proportion of the whole
bulk and volume of the stream. Such being their relation to
each other, it is obvious that the mere use by one of them of all
the water, unaccompanied by any act of exclusion against the
other, or by the assertion of any superior or exclusive claim, is
not in its nature adverse, does no injury, and affords no cause of
complaint or action. The right to an exclusive use of the water
may undoubtedly be acquired by adverse possession and enjoy-
ment, where it is real and actual. Thus the proprietor who first
lawfully erects his dam across the stream, to create a fall by
means of which he may operate his mill, has a right afterwards
to maintain it against all other proprietors, both above and below
him ; and to this extent priority of occupancy gives priority of
title. *Cary* v. *Daniels*, 8 Met. 466. *Thurber* v. *Martin*, 2 Gray,
394. *Gould* v. *Boston Duck Co.* 13 Gray, 442. So where the
owners of a mill situated on a tributary to the main stream had,
for more than twenty years, by means of a canal dug and main-
tained for that purpose, diverted and used the water of the latter
for their own individual benefit, it was held that they had
thereby, by adverse enjoyment, acquired an absolute right to
such use of the water, against all the riparian proprietors be-
tween the point where it was taken out by the canal above and
returned to the stream again below their mill. *Bolivar Manuf.
Co.* v. *Neponset Manuf. Co.* 16 Pick. 241. And if the owner of
land on one side of a river erects a mill dam entirely across it,
without obtaining permission from the owner of the land on the
opposite shore, this is an adverse and injurious invasion of the
rights of the latter, for which he may presently maintain an ac-
tion, although he has no immediate occasion to make use of the
water for any purpose of his own, and suffers no actual loss
thereby. And if the dam be continued for a sufficient length of
time, this will authorize a jury to presume a grant of the right to
abut the dam on such opposite shore, and to use to the exclusion
of all other persons the whole of the water held back and accu-
mulated by and above it. *Bliss* v. *Rice*, 17 Pick. 23. But where
**a** proprietor of land upon one shore appropriates and applies to

his individual use so much of the passing water as he is enabled to do, even if it be the whole of it, by means of structures erected upon and within the limits of his own estate, and the proprietor of the land on the opposite shore neither uses nor seeks to use, nor makes any provision, nor has any occasion, for the use of any part of the stream or proportion of the water to which he is entitled, there is nothing adverse in the action of the former. He does nothing for which an action can be maintained against him, or nominal damages recovered in the assertion and vindication of an invaded right. In such circumstances, they stand towards each other in the relation, and with substantially the rights, of tenants in common, where the possession of one is deemed to be the possession and for the benefit of all ; and their respective rights will continue to be protected and preserved to them, until some positive act of actual and exclusive adverse possession by which one of the parties is directly interfered with, and prevented from enjoying his equal privilege in the use of the water.

Applying these principles to the facts disclosed in the report, it becomes apparent that no increased or extended right beyond his right as an owner of the land bounded by the Deerfield River, was or could have been acquired by Crittenden, or by those under whom he derived his title, by any adverse possession or enjoyment. The claim to this by the plaintiffs cannot therefore be maintained.

The conclusion from all these considerations is plain and obvious. The surplus water flowing over the top of the grist-mill flume, out of which the plaintiffs have a right and privilege of taking to their own use a quantity equivalent to two hundred square inches under a fourteen foot head, is that proportion of the whole stream which shall be left to flow thence after all those who have rights and privileges prior in right to the plaintiffs shall have taken and applied to their own use all the water to which they are respectively entitled. These are the rights, as they have already been explained, of the riparian proprietor on the Buckland bank ; of Crittenden for the mills as they existed at the time of his conveyance to Pratt in 1843 ; and of the proprietors

of the tannery, the rake shop of Simonds, and the scythe shop of Morse. The defendants have become proprietors of all these rights and privileges, and during all the time when the injuries complained of in the bill are alleged to have been committed, they were in the constant use of water from the stream, appropriating it for their own benefit. But they contend that they used and appropriated no more or greater quantities than they were lawfully entitled so to use and appropriate. If they have taken no more of the water than they were thus entitled to take, whatever may have been the diminution of the surplus flowing over the top of the grist mill flume, they have done no wrong or injury to the plaintiffs of which they have a right to complain. But if they have taken more, and have thus deprived the plaintiffs of the enjoyment of the privilege to which they were entitled, the latter have a right to recover compensation for the damage they have sustained, and to obtain protection against future injury of the like kind. These are questions of fact which remain to be submitted to a jury.

The plaintiffs further contend that the new dam and the canal and bulkhead connected therewith were so constructed by Lamson, Goodnow & Co. as to impede or retard the entrance of the water to their mills, and to diminish the surplus flowing over the top of the grist-mill flume, and that they have produced this injurious effect. This is denied by the defendants; and they further allege that whatever may have been the effect of these various works, they were all constructed and arranged with the knowledge, acquiescence and consent of the plaintiffs. If the latter did so acquiesce and consent, they cannot justly complain of, or recover compensation for, any damage which has thereby been occasioned to them. Such acquiescence and consent are in the nature of a contract, which, when fulfilled by the defendants at their cost and charge, must be obligatory upon both parties, although the enterprise upon its completion has been found not to afford the benefits which were anticipated from it. But whether any damage to the plaintiffs has actually resulted from, or been produced by, these alleged causes of injury, and whether they knew of, and acquiesced in, and consented to these works and

arrangements, are also questions of fact, to be submitted to the determination of a jury.

It was insisted, in the course of the argument for the defendants, that they have the right to use whatever amount of wate has been saved by them by tightening and stopping leaks in the race ways and flumes since 1843. But in the conclusions to which we have arrived in respect to the rights of the parties, it becomes unnecessary to make this matter a subject of special consideration.

This action must therefore stand continued for trial upon issues to be framed under the direction of the court. When the questions of fact involved in these issues shall have been determined, it will remain to be considered whether any further proceedings are necessary to the proper disposition of the bill, and to the rendition of final judgment upon it. *Case to stand for trial.*

*J. Wells,* for the plaintiffs. Crittenden's title extended to the middle of the bed of the river; he had therefore the means, and the right, to appropriate to his exclusive use the whole of the current which flowed over his land. *Wright* v. *Howard,* 1 Sim. & Stu. 190. *Webb* v. *Portland Manuf. Co.* 3 Sumner, 189. *Crooker* v. *Bragg,* 10 Wend. 260. *Ingraham* v. *Wilkinson,* 4 Pick. 268. *Bardwell* v. *Ames,* 22 Pick. 354. *Knight* v. *Wilder,* 2 Cush. 210. *Trustees of Hopkins Academy* v. *Dickinson,* 9 Cush. 552. *Buddington* v. *Bradley,* 10 Conn. 213. *Bliss* v. *Rice,* 17 Pick. 36. *Tyler* v. *Wilkinson,* 4 Mason, 405. *Cowell* v. *Thayer,* 5 Met. 253. The defendants, by virtue of their title as opposite proprietors, would have had no right to extend their new dam so as to take half of the water of the river, or any part of that flowing over Crittenden's land. *Blanchard* v. *Baker,* 8 Greenl. 270. *Parker* v. *Griswold,* 17 Conn. 288. *Sackrider* v. *Beers,* 10 Johns. 241. By the " surplus," out of which the plaintiffs' power is granted, the excess above such actual use as might be exercised from time to time, within the limits of the prior rights of existing mills, must be intended. The grant of water power to the scythe shop was restricted to use upon that site. The use upon that site has ceased, and can no longer be considered as existing in priority to the plaintiffs. *Ashley* v. *Pease,* 18 Pick. 268

*Tourtellot* v. *Phelps*, 4 Gray, 370. *De Witt* v. *Harvey*, Ib. 486.
Crittenden's ownership of the rake shop in 1843 merged all
separate water rights, as connected with that site. Angell on
Watercourses, § 191. The provision as to the rake shop must be
construed with reference only to that building. Its subsequent
removal, the erection of a new and larger building in its place,
and the change of use, prevent the continuance of the restriction
upon the plaintiffs. At any rate, the original privilege to that
site, as described in the deeds, should be considered as limited
to the actual use by Simonds.

*C. Allen*, for the defendants.